IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Indiana University of | : | |
| Pennsylvania, | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| Indiana County Board | : | |
| of Assessment Appeals, | : | |
| Indiana Area School District, | : | No. 1923 C.D. 2014 |
| and Indiana County | : | Argued: June 18, 2015 |

BEFORE:   HONORABLE DAN PELLEGRINI, President Judge
          HONORABLE BERNARD L. McGINLEY, Judge (P.)
          HONORABLE P. KEVIN BROBSON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE McGINLEY                    FILED:  September 17, 2015

Indiana University of Pennsylvania (Appellant) appeals from the Final Order of the Court of Common Pleas of Indiana County (Trial Court) that affirmed the determination of the Indiana County Board of Assessment Appeals (Board) and overruled the appeal of the Appellant as to the taxability of certain portions of the Robertshaw Property.[1]  For the following reasons, this Court affirms.

The Robertshaw Property was deeded to the Pennsylvania State System of Higher Education (PASSHE), for the use of Appellant by the Robertshaw Controls Company in 1984.  Deed to the Robertshaw Property at 1; Reproduced Record (R.R.) at 018a.  Appellant is a subsidiary of PASSHE pursuant

---

[1] The Robertshaw Property consists of 22.93 acres of land located in White Township, Indiana County, Pennsylvania with a building on the property located at 650 South 13th Street, Indiana, Pennsylvania 15705.

to Section 2002-A of the Public School of 1949 (Code).[2] Appellant has operated the Indiana County Small Business Incubator (Incubator) at that location since 1986. Appellant also uses the space at the Robertshaw Property for administrative offices and classrooms. The Robertshaw Property was originally classified as tax exempt under the Keystone Opportunity Enterprise Zone. The Keystone Opportunity Enterprise Zone expired in 2011.

In July 2010, the Board sent notice to Appellant that the Robertshaw Property would no longer be classified as tax exempt beginning in 2011. In March of 2011, Appellant received a real estate tax notice from the Board demanding taxes in the amount of $30,206.15 based on an assessed value of $992,970.22.

Appellant filed for declaratory relief in this Court's original jurisdiction and requested this Court to declare that the Appellant was the "sovereign Commonwealth" and its property immune from taxation. Pennsylvania State System of Higher Education v. Indiana Area School District (Pa. Cmwlth., No. 184 M.D. 2011, filed April 5, 2012), *aff'd*, 69 A.3d 236 (Pa. 2013) (IUP Slip Opinion I).

This Court found:

> [Appellant] is 'part of the Commonwealth's system of higher education.' It serves and carries out a particular function for the Commonwealth, as opposed to being ***the*** Commonwealth. Therefore, for tax immunity purposes,

---

[2] Act of March 10, 1949, P.L. 30, 24 P.S. § 20-2002-A *as amended*. Section 2002-A of the Code was added by the Act of November 12, 1989, P.L. 660.

2

[Appellant] is not the equivalent to ***the sovereign Commonwealth***. Property owned by [Appellant] is not owned ***outright*** by the Commonwealth, and it is not entitled to absolute, unqualified real estate tax immunity. (Citation and footnote omitted, emphasis in the original.)

Based on the statutory characteristics of [Appellant], [Appellant] is an 'agency or instrumentality' of the government which is entitled to the initial presumption of real estate tax immunity. This presumption, however, may be overcome if [Appellant] acquired or used the [Robertshaw] Property outside its authorized governmental functions.

….
To the extent that the [Robertshaw] Property houses classrooms, laboratories, libraries, study halls, auditoriums, workshops, etc., which are used by the university, its faculty, employees and students, for teaching and educational purposes, then it shall not be subject to real estate taxes. However, those portions of the [Robertshaw] Property which are leased to any third party ***in exchange for rental income***, are subject to taxation, and do not enjoy tax immunity because they are not used for [Appellant's] governmental purpose which is the provision of education. (Emphasis in the original.)

IUP I Slip Opinion at 10-15; R.R. at 350a-355a.

This Court granted the Board's Application for Summary Relief[3] and denied the Appellant's Petition for Review in the Nature of Declaratory Judgment. IUP I Slip Opinion at 16; R.R. at 356a. An evidentiary hearing was held before the Board, and it determined the Incubator portion of the property was taxable. That determination was appealed to the Trial Court.

---

[3] The Board, Indiana Area School District, and the County of Indiana, filed for Summary Relief and requested that the Board hold an evidentiary hearing on whether the Appellant was leasing portions of the Robertshaw Property to third party commercial entities in exchange for rental income. IUP I Slip Opinion at 15; R.R. at 355a.

A hearing was held on June 4, 2014, at which time the Board presented Frank Sisko (Sisko), the Chief Tax Assessor of Indiana County as a witness. Hearing Transcript, (H.T.) June 4, 2014, at 12; R.R. at 483a. Sisko described how the Board arrived at the tax assessed on the Robertshaw Property: "The assessed value was arrived based on the square footage provided at the hearing of 27,946. That figure was multiplied by a rate per square foot based on the last reassessment, our appraising manual, and then different factors for depreciation and such were given to arrive at the [$]61,210." H.T. at 14; R.R. at 485a. This figure was based on the portion of the Robertshaw Property used for the Incubator. H.T. at 18; R.R. at 489a.

Appellant presented Dr. Robert Boldin (Dr. Boldin) as a witness. H.T. at 19; R.R. at 490a. Dr. Boldin is a professor of finance at Appellant, and oversees the Incubator. H.T. at 20; R.R. at 491a. Dr. Boldin testified that the Incubator is "part of an umbrella operation of management services group which is … under the Eberly College of Business and Technology." H.T. at 23; R.R. at 494a. Students are eligible to intern and otherwise work with the businesses in the Incubator: "Periodically the tenants will ask if there are any students that might be available either as an internship or just a straight working … for their company." H.T. at 23-24; R.R. at 494a-495a. However, only "four or five" students per year perform services for those businesses leasing space from the Incubator. H.T. at 30; R.R. at 501a. Some professors do, however, incorporate Incubator activities into their classes and Dr. Boldin explained that:

> A number of companies that have been in the [I]ncubator
> have been studied, if you will, by Dr. [Stephen]
> Osbourne's students and typically what happens is if a

4

company needs a marketing study … or an accounting system needs to be put in, he will then put together a team of … five or six students. And he runs that as a course so throughout the semester they will be working on that particular project…

H.T. at 27; R.R. 498a.

Appellant presented Susanna Sink (Sink) as a witness. H.T. at 37; R.R. at 508a. Sink is the associate vice president of finance at Appellant and serves as treasurer and controller. H.T. at 38; R.R. at 509a. Sink testified that Appellant has to prepare information about capital assets "as part of what we call the FIN report which is a huge template that [PASSHE] asks us to complete… when we send those reports to [PASSHE] they [sic] combine all 14, the institutions as well as the office of the Chancellor, and then they [sic] are required to report that direct to the State." H.T. at 39-40; R.R. at 510a-511a. Sink also testified that PASSHE is included as a discretely presented component unit in the Commonwealth's Comprehensive Annual Financial Report. H.T. at 44; R.R. at 515a. "Discretely presented component units can be other organizations of which the nature and significance of their relationship with the primary government is such that the exclusion of these organizations from the primary government's financial statements would be misleading." H.T. at 43; R.R. at 514a. Counsel for Appellant stated that the purpose of presenting this evidence was to show that Appellant was so closely related to the Commonwealth that Appellant must be treated as an extension of the Commonwealth government. H.T. at 45-46; R.R. at 516a-517a.

Last, Appellant presented Dr. Cornelius Wooten (Dr. Wooten) as a witness. H.T. at 49; R.R. at 520a. Dr. Wooten is the vice president of administration and finance at Appellant. H.T. at 50; R.R. at 521a. Dr. Wooten testified that the Robertshaw Property "has three distinct spaces." H.T. at 50; R.R. at 521a. There is "an educational space area, an administrative space and of course the [I]ncubator space." H.T. at 50-51; R.R. at 521a-522a. Dr. Wooten agreed with Appellant's counsel that Appellant received $90,000 in rental income from the Incubator, but invested about $310,000 of its money into operating the Incubator. H.T. at 54; R.R. at 525a. "***We don't use the term 'profit'. We are in fact a non-profit organization…[w]e are not in the process of making a profit. We are in the business of providing instructional services and to provide economic development….***" (Emphasis added.) H.T. at 53; R.R. at 524a.

> The Trial Court found:
>
> The issue remaining for this Court to decide is whether portions of the property were in fact leased to third parties for rental income. Testimony from each party indicated that this is the case. While [Appellant] maintains that service to the community and promoting economic development are among the purposes of the Incubator, it does not negate the fact that space within the Robertshaw [P]roperty is leased to third parties not affiliated with IUP.

Opinion and Order of the Trial Court, September 23, 2014, at 3-4; R.R. at 586a-587a.

The Trial Court dismissed Appellant's appeal, and affirmed the Board's decision. Appellant appeals that Order to this Court.

Appellant presents two issues on appeal.[4] The first issue is whether the Incubator property is immune from taxation, and the second is whether there is an exemption from taxation that would apply to the Incubator.

## I. Whether the Robertshaw Property is Immune from Taxation

The last time this Court reviewed this controversy, this Court held that Appellant was an agency or instrumentality of the Commonwealth, and was not the government of the Commonwealth proper. IUP I Slip Opinion at 10-11; R.R. at 350a-351a. Property owned by Commonwealth agencies or instrumentalities may be taxed when that property is not used or acquired for an authorized purpose. Southeastern Pennsylvania Transportation Authority (SEPTA) v. Board of Revision of Taxes, 833 A.2d 710 (Pa. 2003).

In SEPTA, SEPTA acquired an office building in downtown Philadelphia to use as its new headquarters. Id. at 711. There was more space in the building than what was needed for offices, so SEPTA leased the extra space to private businesses, government agencies, and non-profit organizations in order to raise additional revenue. Id. SEPTA's main mission is to provide public transportation in southeastern Pennsylvania. Id. at 716. Even though SEPTA is authorized under 74 Pa. C.S. § 1741(a)(12) to acquire and dispose of property and authorized under 74 Pa. C.S. § 1741(a)(24) to lease property to third parties in order to raise additional revenue, these activities do not directly involve operating

---

[4] In tax assessment cases, this Court considers whether the trial court abused its discretion, committed an error of law, or reached a decision not supported by substantial evidence. Downingtown v. Chester County Board of Assessment Appeals, 913 A.2d 194, 198 (Pa. 2006).

7

a public transportation system in southeastern Pennsylvania. Id. at 716-717. Because the landlord activities were not directly linked to SEPTA's purpose, the Pennsylvania Supreme Court held that the real estate used in the landlord activity fell outside the scope of governmental immunity and was subject to local property taxes. Id. at 717.

Like SEPTA, Appellant is a Commonwealth agency. IUP I Slip Opinion at 10-11; R.R. at 350a-351a. Commonwealth agencies have immunity from taxation, but only when the agency has acted within the scope of its authorization and within the purpose of its operation. SEPTA, 833 A.2d at 715. Appellant is authorized to act as a landlord under Section 2003-A(b)(3) of the Code[5], 24 P.S. § 20-2003-A(b)(3), to lease as lessor real property. The first part of the immunity test is satisfied. The purpose of Appellant is "the provision of instruction for undergraduate and graduate students to and beyond the master's degree in the liberal arts and sciences and in applied fields, including the teaching profession." 24 P.S. § 20-2003-A(a). Operating a small business incubator is not necessarily incompatible with educating undergraduate and graduate students, but this Court must examine whether the Incubator was used to further that purpose.

Dr. Boldin testified "approximately four or five" students per year perform services for the business leasing space from the Incubator. H.T. at 30; R.R. at 501a. The opportunity to work with the businesses at the Incubator is open to all students and not restricted to business students. H.T. at 35; R.R. at 506a. There is no requirement that a lessee of the Incubator space is a student or a former

_____

[5] This Section was added by the Act of November 12, 1982, P.L. 660.

8

student of the Appellant and current or former students renting space at the Incubator did not happen very often. H.T. at 31-32; R.R. at 502a-503a.

While Appellant is authorized to lease real estate to third parties under Section 2003-A(b)(3) of the Code, 24 P.S. § 20-2003-A(b)(3), this activity does not directly advance the main purpose of Appellant to provide undergraduate and graduate education under Section 2003-A(a) of the Code, 24 P.S. § 20-2003-A(a). As explained hereafter, the portion of the Robertshaw Property leased for the Incubator is taxable under the current, valid, legal analysis.

However, Appellant asserts that the law has recently changed regarding the taxability of property owned by Commonwealth agencies pursuant to City of Philadelphia v. Cumberland County Board of Assessment Appeals, 81 A.3d 24 (Pa. 2013) and Reading Housing Authority v. Board of Assessment Appeals of Berks County, 103 A.3d 869 (Pa. Cmwlth. 2014).

City of Philadelphia involved a unique, one of a kind fact pattern. It concerned a nearly two-hundred year old charitable trust (Girard Trust) created by Stephen Girard in his will in 1830 and administered by a quasi-governmental entity as a trustee for almost two-hundred years. City of Philadelphia, 81 A.3d at 25-29. At the time the Girard Trust was created, there was no legal framework that authorized the City of Philadelphia and the Commonwealth to carry out the terms of the trust. Special legislation was enacted as a result. Id. at 30. The trustee functions were delegated to an agency created by the General Assembly known as the Board of City Trusts in 1869. Id. at 33. The Board of City Trusts acquired

9

property in Cumberland County in 2001 and rented part of it to the Office of Attorney General. Id. at 41. The Board of Assessment Appeals determined the property which was rented to the Office of Attorney General was taxable. Id. The Board of City Trusts appealed to the Cumberland County Court of Common Pleas. City of Philadelphia, 81 A.3d at 41. The Cumberland County Court of Common Pleas found the Girard Trust and the Board of City Trusts to be Commonwealth agencies and the rental of property to the Office of Attorney General was a valid public use of the property and not taxable. Id. at 41-42. Cumberland County appealed the ruling to this Court, and this Court held that the Board of City Trusts was not a Commonwealth agency because there was no connection between the Board of City Trusts and the operations of government other than the Board of City Trusts was created by an act of the General Assembly. Id. at 42-43.

Our Pennsylvania Supreme Court has reviewed the prior case law regarding Commonwealth agencies and immunity from local real estate taxes. Id. at 50-52. Appellant contends the Pennsylvania Supreme Court overruled SEPTA. This Court disagrees. In City of Philadelphia, our Supreme Court noted:

> [T]he Court determined that even if an entity is clearly a governmental agency or instrumentality, it may not automatically claim immunity from local real estate taxation for property leased to third-party commercial entities. The Court noted that SEPTA is part of the Commonwealth sovereign and entitled to presumed immunity; its enabling legislation also authorizes it to lease real estate in order to raise revenue and reduce expenses. Nevertheless, to the extent that SEPTA was acting as a 'commercial landlord' at its headquarters building in Philadelphia, the Court held that leasing real estate to commercial tenants who were not part of or associated with SEPTA, 'solely to raise revenue,' was

10

> outside the scope of SEPTA'S immunity because the activity was not sufficiently connected to SEPTA'S stated purpose of providing a metropolitan public transportation system. ***Although the lease arrangements raised revenue and lessened public funding, they were still commercial ventures not eligible for immunity: 'In that respect, SEPTA is like any other commercial landlord with which it competes as a landlord.***

City of Philadelphia, 81 A.3d at 51 (citation omitted and emphasis added).

Nowhere in that discussion or in the rest of the case does the Pennsylvania Supreme Court comment regarding whether SEPTA is no longer valid case law. SEPTA is relevant case law to describe the landscape of that particular area of law.[6] Further, the concurring opinion stated SEPTA was applicable law and argued that the fact pattern in City of Philadelphia was similar to SEPTA. City of Philadelphia, 81 A.3d at 56 (Saylor, J., concurring). The Pennsylvania Supreme Court found the charitable trust was immune from local real estate taxation:

> In this historical and legal landscape, it would seem to be a fool's errand to attempt to determine whether the Girard entities comprise a Commonwealth agency in the

---

[6] Appellant also points to the discussion of Pennsylvania State University v. Derry Township School District, 731 A.2d 1272 (Pa. 1999), for the proposition that the "pivotal factor should be whether the institution's real property is so thoroughly under the control of the Commonwealth that, effectively the institution's property functions as Commonwealth property." Id. at 1274. The analysis used in Pennsylvania State University was applied to determine whether an entity is a Commonwealth agency, not whether an entity is immune from local real estate taxation. In that case, the Pennsylvania Supreme Court found the Pennsylvania State University was not a Commonwealth agency and not immune from local real estate taxation. Id. at 1274-1275. However, it does not follow that if an entity is determined to be a Commonwealth agency, then it has unqualified immunity from local taxation. See [SEPTA] v. Board of Revision of Taxes, 833 A.2d 710 (Pa. 2003); Delaware County Solid Waste Authority v. Berks County Board of Assessment Appeals, 626 A.2d 528 (Pa. 1993).

> modern sense by squeezing a *sui generis* creature of the nineteenth century – when the Commonwealth itself was in its infancy – into a twentieth century (and largely late twentieth century, at that) decisional paradigm deriving from disputes concerning waste disposal sites, airports, and evolving land grant universities.… [T]he historical status of the Girard entities properly gives us pause before stepping in, as a judicial matter, and rendering a decision that may well upset reliance interests and cause severe economic dislocation.
>
> ….
> [G]iven the General Assembly's historical interest in, and concern with the Girard Entities, we believe it better that that policy determination be considered and decisively rendered by that body, rather than by a Court attempting to apply new doctrines to old, and rather unique, relationships.
>
> We conclude, therefore, that the Trust, College, and Board of the City Trusts and, by extension, the real estate holdings of the Girard Trust, retain immunity from local property taxation as, collectively, part of the sovereignty of the Commonwealth of Pennsylvania.

City of Philadelphia, 81 A.3d at 54-55.

Unlike the trust in City of Philadelphia, Appellant is a subsidiary of PASSHE, which is explicitly named as a "government instrumentality" in Section 2002-A(a) of the Code, 24 P.S. § 20-2002-A(a). As cited, Section 2002-A(a) was enacted in 1982. PASSHE and Appellant are instrumentalities of the Commonwealth, and were designated as such during the late twentieth century when the case law concerning this particular issue was established. SEPTA is still applicable law for this type of fact pattern.

Reading Housing Authority concerned the renting of mixed-use apartments by the Reading Housing Authority (Authority) where eighty percent of

the units were priced at the market rate, and twenty percent of the units were set aside for low-income renters. Reading Housing Authority, 103 A.3d at 870-871. The Board of Assessment Appeals of Berks County attempted to tax the eighty percent portion of the rental properties that were priced at the market rate. Id. at 871-872. The main purpose of the Authority was to provide "subsidized housing to individuals of modest or low income". Id. at 873. This Court found the Authority was acting in the scope of its authority and the mixed-use apartments furthered its purpose even though not all of the units were rented to low-income renters. Id. at 873-875. The Authority was authorized by statute to create and lease mixed-use projects. Id. at 874. Evidence was submitted that it is bad public policy to concentrate low-income renters into one area and mixed-use projects are a better method of carrying out the Authority's purpose. Id. This Court also noted that the market rate and the subsidized apartments constitute an integrated whole as they are both necessary for the success of the mixed-use project because the market rate units provide the support for the subsidized units. Reading Housing Authority, 103 A.3d at 875.

Reading Housing Authority is distinguishable from the present controversy. Appellant is authorized to lease office space to third parties, but those leases do not further Appellant's purpose of educating undergraduate and graduate students. The Incubator also does not form an "integrated whole" with the rest of Appellant as Appellant may carry on its educational mission without the Incubator. Whether Appellant spent more money operating the Incubator than the Appellant received in rental income is not convincing.

Contrary to Appellant's assertions, the law regarding governmental immunity from local real estate taxation did not change with City of Philadelphia and Reading Housing Authority. SEPTA is applicable to this controversy and while we agree Appellant acted within its statutory authorization, its actions did not promote the purpose of providing undergraduate and graduate education. The portion of the Robertshaw Property, the Incubator, which was leased to third parties in exchange for rental income is not immune from local real estate taxation.[7]

## II. Whether the Robertshaw Property is Exempt from Taxation

Appellant contends that if this Court finds that immunity does not apply to the Robertshaw Property, it should still not be taxed because the Incubator conforms to a public purpose or is otherwise exempt from local taxation. Appellant points to 53 Pa. C.S. § 8812(a)(3) and 53 Pa. C.S. § 8812(a)(8) of the Consolidated County Assessment Law (Law).

An entitlement to a tax exemption should be strictly interpreted against the taxpayer. In re Appeal of Pennsylvania Easter Seal Society from Real Estate Taxation Assessment, 445 A.2d 1369, 1370 (Pa. Cmwlth. 1981) citing Board of Revision of Taxes of Philadelphia v. United Fund of Philadelphia, 314 A.2d 530 (Pa. Cmwlth. 1973).

---

[7] Certainly the number of students employed and trained by the business tenants is relevant to the issue of taxation. But evidence as to the benefit to the Appellant and its students was *de minimis* on this record.

53 Pa. C.S. § 8812(a)(3) of the Law provides: "All hospitals, universities… endowed and maintained by *public or private charity* as long as all the following apply…The property of *purely public charities* is necessary to and actually used for the *principal purposes of the institution* and *not used in such a manner as to compete with commercial enterprise*." (Both bold and italics emphasis added.) It was established in IUP I Slip Opinion that Appellant is a Commonwealth agency. It is not a public or private charity. For the sake of argument, even if Appellant was a private or public charity, the leasing of Incubator space to third party commercial enterprises did not further the "principal purpose of the institution", which is education. Additionally, the Incubator property was used in a way "as to compete with commercial enterprise."

On cross examination, Dr. Boldin testified:

Q. [Michael Clark, Counsel for Indiana County] You would agree there [are] a lot of commercial buildings here in Indiana that lease space to tenants?

A. [Dr. Boldin] Sure.

Q. And those tenants could be starting up businesses?

A. They could.

Q. And would you agree that those commercial landlords compete with [Appellant] in leasing space for businesses?

A. Well, our emphasis is on new business start up[s] primarily.

Q. But—

A. Or developing businesses.

15

Q. But would you agree that there are commercial landlords who have start up new businesses in their buildings?

A. I suppose.

Q. And they compete with [Appellant] in leasing space?

A. Probably.

H.T. at 34; R.R. at 505a.

The exemption in 53 Pa. C.S. § 8812(a)(3) of the Law does not apply to Appellant here because Appellant is not a public or private charity, the Incubator is not part of the principal purpose of the Appellant, and the Incubator is used in a way in which it competes with commercial landlords.

53 Pa. C.S. § 8812(a)(8) of the Law exempts from local taxation "[a]ll other public property used for public purposes…" In this controversy, the trial court determined that Appellant leased space in the Incubator to entities not affiliated with Appellant in exchange for rental income. Trial Court Opinion at 3-4; R.R. at 586a-587a. For the purposes of exemption from taxation as a public use, the test is whether the property has been leased for a public or private purpose. Appeal of the Municipal Authority of Borough of West View, 113 A.2d 307, 309 (Pa. 1953).

The general rule is when a governmental entity leases property for a private or commercial purpose, that lease does not count as a "public purpose", and that property will not be exempt from taxation. Id. at 310. Since it has been determined that portions of the Robertshaw Property have been leased to non-

16

governmental third party entities in exchange for rental income, the public use exemption of 53 Pa. C.S. § 8812(a)(8) of the Law does not apply to the Incubator portions of the Robertshaw Property.

Accordingly, this Court affirms.

_____
BERNARD L. McGINLEY, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Indiana University of Pennsylvania, | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| Indiana County Board of Assessment Appeals, | : | |
| Indiana Area School District, | : | No. 1923 C.D. 2014 |
| and Indiana County | : | |

## **O R D E R**

AND NOW, this 17th day of September, 2015, the Order of the Court of Common Pleas of Indiana County in the above-captioned matter is affirmed.

_____
BERNARD L. McGINLEY, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Indiana University of            :
Pennsylvania,                    :
          Appellant     :
                                 :
       v.              :  No. 1923 C.D. 2014
                                 :  Argued:  June 18, 2015
Indiana County Board             :
of Assessment Appeals,           :
Indiana Area School District,    :
and Indiana County               :


BEFORE:  HONORABLE DAN PELLEGRINI, President Judge
            HONORABLE BERNARD L. McGINLEY, Judge (P.)
            HONORABLE P. KEVIN BROBSON, Judge


*OPINION NOT REPORTED*

**DISSENTING OPINION**
**BY JUDGE BROBSON**           **FILED:  September 17, 2015**


       I agree with the majority that the Pennsylvania State System of Higher Education (PASSHE), which owns the Robertshaw Property, is an instrumentality of the Commonwealth. *See Pa. State Univ. v. Derry Twp. Sch. Dist.*, 731 A.2d 1272 (Pa. 1999) (comparing and contrasting PASSHE, a Commonwealth instrumentality and thus immune from taxation, with Pennsylvania State University). Real property of PASSHE is, therefore, "presumed to be immune, with the burden on the local taxing body to demonstrate taxability." *City of Phila. v. Cumberland Cnty. Bd. of Assessment Appeals*, 81 A.3d 24, 50 (Pa. 2013) (*Girard Trust*). Whereas, however, the majority concludes that the operation of the Indiana County Small Business Incubator (Incubator) within the Robertshaw

Property, which provides students with real-world work experience and supports new and emerging businesses, falls outside of the scope of PASSHE's authorized purposes and, thus, outside of the scope of its immunity, I would conclude otherwise. I, therefore, respectfully dissent.

The only similarities between this case and *Southeastern Pennsylvania Transportation Authority v. Board of Revision of Taxes*, 833 A.2d 710, 711 (Pa. 2003) (*SEPTA*), is that both cases involve an instrumentality of the Commonwealth leasing a portion of its property to a third-party tenant. This act, however, does not *ipso facto* take the leased premises outside of the scope of the instrumentality's immunity from taxation. To the contrary, the Supreme Court of Pennsylvania in *SEPTA* found that a metropolitan transportation authority acted outside its authorized governmental purposes because it (a) leased its otherwise exempt property to a commercial tenant whose activities were entirely unrelated to the transportation authority's activities; *and* (b) for the sole purpose of generating revenue and reducing costs. In this regard, it acted no differently than any other commercial landlord and thus acted outside of its authorized purposes and, thus, outside of the scope of its immunity. *SEPTA*, 833 A.2d at 716-17. As then-Justice (now Chief Justice) Saylor observed in his concurring opinion in *Girard Trust*, "the immunity . . . question hinges on whether the agency, in . . . . renting out the property, is acting within or outside of its own authorized purposes." *Girard Trust*, 81 A.3d at 56 (Saylor, J., concurring).

On the issue of tax immunity, all doubts are to be resolved in favor of the taxpayer, and, as noted above, it is the taxing authority's burden to establish that the property in question is not immune from taxation. *Lehigh-Northampton Airport Auth. v. Lehigh Cnty. Bd. of Assessment Appeals*, 889 A.2d 1168, 1175-76

(Pa. 2005). The evidence before the trial court consisted of a joint exhibit book, admitted by stipulation of the parties. (Reproduced Record (R.R.) 477a.) The only other exhibit offered by the taxing authorities in this case was the county tax assessment card for the Robertshaw Property. The taxing authorities called only one witness—Frank Sisko, the Chief Assessor for Indiana County. Mr. Sisko testified as to the assessed value of the portion of the Robertshaw Property that the County deemed to be taxable, that being the Incubator space. (R.R. 484a-85a.) Mr. Sisko also testified about the "license agreements" that PASSHE executes with its Incubator tenants. Mr. Sisko testified that the County used the square footage set forth in the license agreements to arrive at the amount of taxable space in the Robertshaw Property. (R.R. 487a.)

Appellant was the only party to the appeal before the trial court that offered testimony about the Incubator's operations. Its first witness was Dr. Robert J. Boldin, a professor of finance at Indiana University of Pennsylvania (IUP), a PASSHE institution. Dr. Boldin has overseen the Incubator in the Robertshaw Property since 1997, spending approximately 25% of his work-related time in the Incubator. (R.R. 491a.) Dr. Boldin testified that the Incubator looks to attract small, start-up companies as tenants: "[T]he key here is that we want to look at those companies that have the potential for growth and that will actually begin to hire employees because economic development is really the critical factor for the [I]ncubator to be in operation." (R.R. 493a-94a.) Unlike a typical commercial landlord, one of the goals of the Incubator is to actually see tenants leave, or "graduate," from the Incubator. (R.R. 495a-96a, 499a.)

According to Dr. Boldin, the "focus of the [I]ncubator is to provide the service to the community which is one of the three pillars of the University's

function[:] teaching, scholarly research and community service." (R.R. 494a.) The Incubator also creates opportunities for student employment and internships, as well as opportunities for IUP students to provide value-added services, such as web site development. In this way, the Incubator provides opportunities for all IUP students, not just business students. (R.R. 495a.) During the 2013-2014 academic year, Dr. Boldin estimated that four or five, maybe more, students provided services to Incubator tenants. (R.R. 501a.) Although tenants in the Incubator are not required to use the offered services, Dr. Boldin testified that he asks all new tenants to reach out to the Director of the Small Business Development Center for assistance. (*Id.*)

Dr. Boldin also testified about the IUP Management Services Group, which oversees the Incubator as part of the Eberly College of Business and Information Technology at IUP (College of Business). (R.R. 494a.) The Management Services Group provides services to Incubator tenants, including assistance with government contracting and other services, such as marketing studies and implementation of accounting systems. (R.R. 498a.) The Management Services Group also prepared a study about the economic impact of the Incubator to Indiana County over two decades—from 1990 to 2010. The study reported a conservative estimate of economic benefit to Indiana County from the Incubator over this period at over a billion dollars. (R.R. 499a-500a.)

Appellant also called Dr. Cornelius Wooten, IUP's Vice President for Finance and Administration, to testify about the Incubator. He offered the following:

> IUP like all educational institutions, we are a three prong
> mission. That will be teaching, scholarship or research
> and service. So those three, these are the three missions
> of IUP like most higher education institutions, be

teaching, research and service. Now, as it relates to the [I]ncubator of what you have heard about the, Dr. Boldin described how the [I]ncubator fit within the Eberly College of Business and also the report of the management services. We feel very strongly that as part of the IUP mission, the mission of instruction, the mission of service, both of those go hand in hand in terms of promoting one of the important aspects here in this Commonwealth of Pennsylvania of economic development. We feel very strongly that IUP has a responsibility to promote economic development. And at the end of the day, everything we do as it relates to students, whether we are talking about the teaching component or the service component, it all fits in and compliments each other. So ultimately, we are there to provide students [the opportunity] upon graduation to be productive citizens so that they can in fact hopefully stay within the Commonwealth of Pennsylvania to promote economic development. So economic development is in fact what the [I]ncubator is all about.

(R.R. 522a-23a.) Dr. Wooten rejected the suggestion that the Incubator competes in the commercial marketplace for tenants:

[I] somewhat disagree with that analysis in the sense that our role is to try to compliment the teaching component as well as the service component and as part of the teaching and service component is to try to compliment and facilitate that effort whereby we will utilize our students as part of the management services component to supplement what we do relative to providing the service component of IUP to promote, once again, economic development. So we serve as an arm, as an opportunity to provide facility towards starting new businesses, developing businesses, to have an opportunity to get the benefit of our services, to get the benefit of students in terms of internships, to get the benefit of our faculty and to get the benefit of our management services. And while certainly ongoing new businesses could naturally get those services if they are not housed in the [I]ncubator, it certainly is more convenient by the mere fact that we are there to help facilitate that effort.

(R.R. 523a-24a.) Dr. Wooten actually refers to the Incubator as a "learning laboratory," where the College of Business can provide services to new and emerging businesses on site as well as opportunities for students. (R.R. 529a-30a.)

Purposes and general powers of PASSHE are set forth in Section 2003-A of the Public School Code of 1949 (Public School Code).[1] Regarding purposes, Section 2003-A(a) of the Public School Code provides:

> The State System of Higher Education shall be part of the Commonwealth's system of higher education. Its purpose shall be to provide high quality education at the lowest possible cost to the students. The primary mission of the system is the provision of instruction for undergraduate and graduate students to and beyond the master's degree in the liberal arts and sciences and in applied fields, including the teaching profession. . . . *Programs of* research and *service may be provided which are approved by the Board of Governors, and which are consistent with the primary mission of the system.* Each institution shall provide appropriate educational facilities, student living facilities *and such other facilities as deemed necessary by the board*.

(Footnote omitted; emphasis added.) This section of the Public School Code grants PASSHE "all the powers necessary or convenient for the carrying out of the aforesaid purposes," including, but not limited to, the express power to lease property "necessary or desirable for carrying out the purposes of the system." Section 2003-A(b)(3) of the Public School Code.

As noted in Section 2003-A of the Public School Code, the Board of Governors of PASSHE is the body vested by the General Assembly with the authority to determine the programs of service that PASSHE should provide as

---

[1] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 20-2003-A, added by the Act of November 12, 1982, P.L. 660.

well as the "necessity and desirability" of facilities for the purposes of meeting PASSHE's mission. Specifically, the Board of Governors is empowered "[t]o establish broad fiscal, personnel and educational policies under which the institutions of the system shall operate." Section 2006-A(a)(4) of the Public School Code.[2] It also has the power "[t]o do and perform generally all of those things necessary and required to accomplish the role and objectives of the system." Section 2006-A(a)(15) of the Public School Code.[3]

Consistent with these powers, on October 16, 1984, the Board of Governors adopted "Policy 1984-10: State System of Higher Education Mission." (R.R. 14a.) It includes the following as missions, or purposes, of PASSHE:

> 5. To provide continuing education and community and public services in accord with the needs and aspirations of citizens and the social, cultural, economic, and technical needs of the Commonwealth.
>
> . . . .
>
> 8. To participate in and help provide leadership for the economic revitalization and development of the Commonwealth.

The Incubator has been in existence since 1986. It is not simply leased commercial space. It is space where, as the record bears out, IUP's College of Business works to enhance economic development in the region by providing low-cost space to new and developing companies while providing services to those tenants and real-world learning opportunities to its students.

---

[2] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 20-2006-A(a)(4), added by the Act of November 12, 1982, P.L. 660.

[3] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. § 20-2006-A(a)(15), added by the Act of November 12, 1982, P.L. 660.

On this record, then, unlike the metropolitan transportation authority in *SEPTA*, it is not at all clear that PASSHE's motives in leasing out Incubator space to new or developing small businesses are purely commercial—*i.e.*, for the sole purpose of generating revenue and reducing PASSHE's costs.[4] To the contrary, the unrebutted record evidence shows that PASSHE operates the Incubator as part of IUP's College of Business and that the Incubator serves a dual mission of PASSHE, as formulated by the Board of Governors under its lawfully-delegated authority, to educate PASSHE students and to promote economic development within the communities in which PASSHE institutions are located.

Allocating, as we must, the burden of proof to the taxing bodies and resolving, as we must, any doubt in favor of the taxpayer, I would conclude that the taxing bodies in this case have failed to meet their burden of showing that PASSHE's leasing activities as part of the Incubator are outside of the scope of PASSHE's authorized purposes and, therefore, failed to show that the leased Incubator space in the Robertshaw Property falls outside the scope of PASSHE's immunity from taxation.[5]

---

[4] Even if we disregard the testimony of Appellant's witnesses, I would conclude that the testimony of Indiana County's Chief Assessor, the taxing authority's only witness, is inadequate to rebut the presumption of immunity.

[5] The majority recognizes that "[o]perating a small business incubator is not necessarily incompatible with educating undergraduate and graduate students." Maj. Op. at 8. The majority, however, then purports to examine "whether the Incubator was used to further that purpose." *Id.* The majority concludes that the Incubator was not used to further that purpose. I can glean from the majority's opinion only two proffered reasons in support of that conclusion. First, on page 9 of its opinion, the majority reasons that PASSHE's leasing of Incubator space "does not directly advance the main purpose of Appellant to provide undergraduate and graduate education." Later, in footnote 7 on page 14, the majority writes: "Certainly the number of students employed **(Footnote continued on next page…)**

Accordingly, I would reverse the Order of the Court of Common Pleas of Indiana County.

_____
P. KEVIN BROBSON, Judge

_____
**(continued…)**

and trained by the business tenants is relevant to the issue of taxation. But the benefit to [IUP] and its students was *de minimis* on this record." Respectfully, I believe that the majority has too narrowly defined the purposes/mission of PASSHE and/or has usurped the Board of Governor's role to determine what programs of services are consistent with the primary mission of PASSHE. Indeed, even the majority, in these passages, acknowledges record support for the conclusion that the Incubator at least indirectly advances the mission of PASSHE and benefits its students. Whether that benefit is substantial or *de minimis* is not relevant to the tax immunity question, but rather is a matter better left to the Board of Governors if or when it evaluates the merits of continuing the Incubator as part of the IUP College of Business.